UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

AUTOMOTIVE BUSINESS CONSULTANTS
LTD., d/b/a METROPOLITAN NY TOWING,
AUTO BODY & SALVAGE ASSOCIATION, and
NORMAN TEITLER,

   ___ Civ. _____ ( )

                Plaintiffs,

**COMPLAINT AND
JURY DEMAND**

     -against-

CITY OF NEW YORK, JONATHAN
MINTZ, and SANFORD COHEN,

                Defendants.
-------------------------------------------------------------x



Plaintiffs Automotive Business Consultants Ltd., d/b/a Metropolitan NY

Towing, Auto Body & Salvage Association ("Metropolitan") and Norman Teitler

("Teitler"), by and through their attorneys, Emery Celli Brinckerhoff & Abady LLP, for

their Complaint allege as follows:

### INTRODUCTION

1.     This action seeks to enjoin severe (and, on information and belief, entirely

unprecedented) summary punishment imposed by the New York City Department of

Consumer Affairs ("DCA") – punishment that is, at best, a grossly arbitrary overreaction

by DCA Commissioner Jonathan Mintz and Deputy General Counsel Sanford Cohen or,

at worst, blatant retaliation against a company and its principal for engaging in speech

and petitioning activity that is squarely protected by the First Amendment to the United

States Constitution. Either way, DCA's conduct is unlawful and must be enjoined.

2.     Plaintiff Norman Teitler owns and operates Metropolitan, a for-profit

association engaged in the business of serving the New York City towing companies that

comprise its membership.  Teitler is well known to DCA, the City agency that primarily

regulates the towing industry, because he is often critical – and at times persistently and

vociferously so – of DCA rules, policies, and practices that adversely affect

Metropolitan's members.  For example, Teitler published an editorial in a magazine

criticizing DCA for its handling of a towing-related litigation that the City had fought and

lost, and he recently testified before the City Council criticizing DCA's application of

rules restricting the transfer of ownership interests in towing companies.

       3.      In or about April 2010, Teitler brought to DCA's attention that the City

had awarded a lucrative towing contract to a company, Runway Towing, that apparently

was not in compliance with DCA's 10% rule (which requires a towing company to obtain

DCA approval prior to transferring an interest of more than 10% of the company to a new

owner).  This issue is important to Metropolitan's members, for the 10% rule

substantially impedes their ability to raise capital or to sell partial interests in their

companies for other reasons.  Teitler, Metropolitan, and its members were frustrated by

what they perceived to be DCA's hypocrisy, and Teitler repeatedly followed up with

Commissioner Mintz and Deputy General Counsel Cohen about the issue.  By June 2010

– nearly two months after Teitler provided documents corroborating his allegations –

DCA still had not taken any action.

       4.      On June 1, 2010, Teitler vented his frustration by sending an email to

Deputy General Counsel Cohen.  In this email, Teitler reiterated that Cohen had not

provided "an adequate response to [his previous] letters" and indicated that he would

"inform [Metropolitan's] members who have an interest to either E-mail or call the

Commissioner directly."  Then, in a sentence that no reasonable person could have read

literally, Teitler stated as follows:

> Maybe, [the members] should ignore the Administrative Code and expect
> that it will take [DCA] several years to sort matters out – it seems to be
> working for Runway Towing.

Especially in context, this lone sentence plainly was not an actual threat by Teitler to

counsel Metropolitan's members to disregard the law. To the contrary, it is obvious that

this sentence was only intended to convey, and did only convey, that it was problematic

that DCA had taken so long to take action against Runway for violating DCA's rules.

5.      DCA's reaction to this sentence was severe, to put it mildly. Indeed,

DCA's reaction was outright bizarre. Insisting on reading Teitler's email literally, DCA

called Teitler into the agency, placed him under oath, and questioned him about his

supposed "threat" to engage in "fraud" by counseling Metropolitan's members to ignore

DCA's 10% rule. That allegation is preposterous, and Teitler steadfastly denied that he

had any such intent. Rather, he maintained – candidly and truthfully – that he was merely

being facetious, that he would never actually counsel anybody to disobey the law, and

that he was merely trying to make the point that DCA has to enforce its 10% rule if it is

to have any teeth.

6.      For some unknown reason, this explanation was not good enough for

DCA. On August 4, 2010, DCA informed Teitler that the agency had concluded that he

had made a "genuine threat" and that it was necessary for the agency to take "emergency

action." Specifically, the agency decided:  (1) to completely prohibit Teitler,

Metropolitan, and its employees from signing, delivering, or filing any paperwork with

the DCA on behalf of any member or client; and (2) to inform all DCA administrative

law judges ("ALJs") that it was "investigating" Metropolitan and that the ALJs should

consider the fact of this "investigation" when "determining the credibility of witnesses" in administrative proceedings in which Metropolitan was representing a member.

7.    Further compounding the injury it was bent on inflicting, DCA issued an intentionally provocative press release – and posted bulletins prominently on its website – announcing that DCA was "investigating" Metropolitan for "engaging in fraudulent and illegal activity," and explaining that Metropolitan had been barred from submitting documents to DCA and that the ALJs had been informed.  Indeed, DCA even went so far as to send letters to some 600 towing companies (including many of Metropolitan's members) advising them of the summary punishment that DCA had meted.

8.    To this day, DCA has not afforded Plaintiffs with *any* notice of the nature of the "fraudulent and illegal activity" in which Plaintiffs allegedly have engaged – apart from the patently absurd suggestion that Teitler defrauded DCA by stating in his June 1 email that "maybe" his members should ignore DCA's rules because it would "take [DCA] several years" to react.  Despite this complete lack of notice or opportunity to be heard, DCA has purposefully decimated Plaintiffs' business.

9.    DCA's conduct is beyond over the top.  It constitutes actionable retaliation for engaging in legitimate and important activity protected by the First Amendment; deprivation of constitutionally protected property and liberty interests without even minimally adequate process; intentional interference with existing contracts and prospective business opportunities; or, at a bare minimum, arbitrary and capricious action that is a plain abuse of discretion.  It should be stopped.

## THE PARTIES

10.     Metropolitan is a New York corporation headquartered at Two 52nd Street, Brooklyn, New York 11232.

11.     Normal Teitler is a citizen of the United States and the State of New York residing at 80 Bay Street Landing, Staten Island, New York, 10301.

12.     Defendant City of New York ("the City") is a municipality organized and existing under the laws of the State of New York. At all times relevant hereto, the City, acting through the DCA, was responsible for the policy, practice, supervision, implementation, and conduct of all DCA matters and was responsible for the appointment, training, supervision, and conduct of all DCA personnel. In addition, at all relevant times, the City was responsible for enforcing the rules of the DCA, and for ensuring that DCA personnel obey the laws of the United States and of the State of New York.

13.     Defendant Jonathan Mintz is the DCA Commissioner. As such, he is responsible for establishing all of DCA's policies, customs, and practices. Defendant Mintz is sued in both his official and personal capacities.

14.     Defendant Sanford Cohen is DCA's Deputy General Counsel. Defendant Cohen is sued in both his official and personal capacities.

## JURISDICTION AND VENUE

15.     This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and New York state common law.

16.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331,

1343(a), 1367(a), and the doctrine of supplemental jurisdiction.

17.    The acts complained of occurred in the Southern District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

### JURY DEMAND

18.    Plaintiff demands trial by jury in this action.

### FACTUAL ALLEGATIONS

**Metropolitan's History of Advocating Before the Department of Consumer Affairs**

19.    Teitler founded Metropolitan in 1992.   Since then, Metropolitan has developed expertise in advocating on behalf of its members before the New York City Council as well as various City agencies, particularly the DCA.   Metropolitan also provides a range of other services for its members, such as preparing paperwork for license applications and renewals; assisting in the preparation of bids for public contracts; helping members find an authorized representative to appear on their behalf in administrative proceedings; and educating our members about new laws, regulations, and standards.

20.    Approximately fifty-five percent (55%) of Metropolitan's business requires that Teitler or other Metropolitan employees interact with the DCA on behalf of its members.

21.    Metropolitan's members pay annual membership dues of $300.00.   Its members have access to its "hot line," as well as consulting and advising on any issues they encounter during the year.   Its members also receive *Auto Voice*, a bi-monthly magazine that Metropolitan publishes for the purpose of advising its membership of developments in the law and the news that are relevant to the industry.

22.     Metropolitan's members also have the option of hiring Metropolitan to provide consulting services for an additional fee, including, for example, to prepare and file paperwork with the DCA.

23.     In his capacity as Executive Director of Metropolitan, Teitler regularly writes letters to the DCA to advise the agency of Metropolitan's members' questions and concerns, advocates for changes to legislation and DCA rules that affect the industry, and testifies before the City Council on matters that affect the industry.

24.     In the past, Metropolitan had a good working relationship with the DCA. For example, the previous DCA Commissioner regularly met with Metropolitan to discuss the concerns and questions of the towing industry raised in letters that Teitler sent on behalf of Metropolitan members.

25.     That cooperative spirit changed when Jonathan Mintz became the acting (and later the permanent) DCA Commissioner in 2005.  Unlike his predecessor, Commissioner Mintz has flatly refused to meet with Teitler, and he has been openly hostile towards the towing industry and Metropolitan.

26.     In its advocacy work, Metropolitan has sometimes had to take a position that is critical of the DCA, such as when the agency is undertaking action that Metropolitan believes is unlawful or contrary to the interests of its membership.  For example, Metropolitan published an article in *Auto Voice* entitled "DCA Commissioner's Arrogance Costs New York City Taxpayers Over $658,000.  U.S. Appeals Court Sees Through DCA's Smoke And Mirrors."  The article criticized the current administration at DCA for its "confrontational" attitude towards the towing industry and exposed the agency's incompetence.

**DCA's Draconian Interpretation of Section 20-110**

27.    Teitler has also spoken up at public hearings of the Council Consumer Affairs Committee, including most recently on May 11, 2010, criticizing the way the DCA interprets and applies section 20-110 of the New York City Administrative Code.

28.    Section 20-110 of the New York City Administrative Code provides: "Where any person or organization becomes the beneficial owner of ten percent or more of the stock of an organization to which a license has been granted pursuant to chapter two, if such person or organization previously did not hold at least a ten percent interest, such license shall immediately become void unless prior written approval of the commissioner of the commissioner's designee is obtained."

29.    Pursuant to Section 20-110, therefore, the DCA Commissioner has to approve the sale or transfer of interest of more than 10% of any organization to any person or organization that did not previously own a 10% interest if the organization being sold has a license from the DCA.  This applies to all of Metropolitan's member towing companies that are licensed by the DCA.  Without such approval, the company would lose its DCA license and have to reapply.  Because many municipal towing contracts require the contractor to have been licensed for at least one year, this effectively means that a company that transfers more than a 10% interest to a new owner will lose important contracts upon which it has relied and based on which it has invested.

30.    Upon information and belief, since Mintz became Commissioner, the DCA has denied *all* Section 20-110 applications from tow truck companies.  In the past, DCA routinely processed such applications and typically granted them.  Now, DCA employees refuse to even *accept* applications for Section 20-110 applications filed by

Metropolitan on behalf of its members, informing Metropolitan that there is no point in filing such applications because they will all be denied.

31.     This blanket denial policy has had a substantial adverse effect on Metropolitan's members, who often have highly leveraged leases and may need to sell part of their business to raise capital or simply to pass a family business on to the next generation.  For this reason, Metropolitan has actively pressed the DCA and Commissioner Mintz to reconsider this policy, both in public hearings before the City Council Committee on Consumer Affairs and in letters addressed directly to Commissioner Mintz.

**Runway Towing's Apparent Exemption from Section 20-110**

32.     In or about early 2010, Metropolitan learned that Runway Towing, Inc. ("Runway") had been awarded a very valuable contract from the New York City Police Department for towing services on the Belt Parkway and Gowanus Expressway. Metropolitan also learned, however, that Runway apparently was not in compliance with Section 20-110 (because the company apparently had transferred its stock from one owner to another without getting DCA approval).  Metropolitan became concerned that DCA apparently was not enforcing Section 20-110 evenhandedly.

33.     In April 2010, Teitler alerted DCA about Metropolitan's concerns and provided supporting evidence that Runway was not in compliance with Section 20-110.

34.     On May 10, 2010, Teitler sent Commissioner Mintz a follow-up letter, emphasizing that Runway's license with the DCA states that Chris Pritsinevelos was the 100% owner of Runway, but that the paperwork supplied to the NYPD in connection with Runway's recent bid indicated that Mr. Pritsinevelos' wife, Cynthia Munoz

Pritsinevelos, was the 100% owner. This suggested that there had been a transfer of interest that should be governed by Section 20-110. In his letter, Teitler asked Commissioner Mintz to explain whether DCA's policy of denying all Section 20-110 applications had been changed or whether Runway was for some reason receiving preferential treatment from the DCA. He urged Commission Mintz to investigate this matter, as there was every appearance either of fraud or of grossly unequal treatment.

35.     On June 1, 2010, Teitler wrote a second letter to Commission Mintz, reminding DCA that he still had not received an official DCA response to his previously stated concerns about Runway. Later that day, Tietler received a response from Sanford Cohen, stating that Section 20-110 remained in effect and that DCA had not yet completed its review into Runway.

36.     Teitler promptly replied by indicating his dissatisfaction with Cohen's response and stating his disbelief that the DCA had still not completed its investigation into this serious matter. Frustrated with the DCA's lack of response and the glacial pace of its investigation into Runway, Teitler wrote:

> "I do not consider your E-mail an adequate response to my letters. I will inform my members who have an interest to either E-mail or call the Commissioner directly. Maybe, they should ignore the Administrative Code and expect that it will take Consumer Affairs several years to sort matters out – it seems it worked for Runway Towing."

## DCA's "Emergency Action" Effectively Barring Metropolitan from Interacting with the Agency

37.     Shortly thereafter, Cohen informed Teitler that he had interpreted Teitler's June 1 email to be a "threat" that Teitler would counsel Metropolitan's members to simply disregard Section 20-110. Cohen informed Teitler that he was investigating him and that Teitler should appear before the DCA for a hearing on June 15, 2010.

Cohen did not inform Teitler about the nature of the allegations or the scope of the investigation. He also did not explain the basis for DCA's supposed jurisdiction to investigate Teitler.

38.    Teitler appeared before the DCA and gave a sworn statement in which he truthfully explained that the tone of his June 1 email was facetious, as is readily apparent; that he never counseled any Metropolitan member to disregard or break the law; and that he never would.

39.    On August 4, 2010, Teitler received another letter via email from Mr. Cohen ("August 4 Letter") stating that "the Department has concluded that you intended your June 1 email as a genuine threat that you will advise Association members to disregard the reporting requirements of the Administrative Code."

40.    The August 4 Letter also accused Teitler of having worked to conceal Runway's fraud from the DCA in the past. That is patently untrue. Cohen suggested that Teitler was previously familiar with Runway's corporate structure because Metropolitan had assisted Runway in applying for a tow truck business license from the DCA in 2005 (and renewals thereafter until 2008). But Metropolitan merely assists its members in completing and filing paperwork; in performing that task, Metropolitan does not independently investigate its members' corporate structures. Instead, Metropolitan accepts its members' representations as truthful, fills out the forms using the information they provide, has them review the forms, and provides them with disclaimer letters (printed on bright orange and yellow paper) that clearly emphasize their obligation to review the paperwork to ensure that it has been accurately completed. Consistent with this practice, Metropolitan accepted at face value Chris Pritsinevelos' representation that

he was the 100% owner of Runway. Mr. Pritsinevelos signed the paperwork to this

effect. Metropolitan did not independently consult Runway's corporate records, nor was

it hired to do so or required by DCA to do so.

41.    The August 4 Letter also alleged that the DCA had "received

information" that Teitler had "advised another tow truck licensee not to disclose fully its

ownership in violation of section 20-110." That is false. Teitler has never advised any

company not to fully disclose its ownership.

42.    The August 4 Letter concluded that "as an emergency measure," the

DCA would no longer accept for filing any documents signed or delivered by Teitler or

any person employed by Metropolitan; and that the agency would submit a letter

describing its purported investigation to every Administrative Law Judge presiding over a

hearing in which a Metropolitan employee appears as an authorized representative.

43.    The DCA then sent a letter to approximately 600 towing companies,

approximately 400 of which are Metropolitan Association members, as well as 3,200 tow

truck drivers, stating that the DCA was investigating whether Metropolitan "has

counseled businesses to provide false information to the Department, or whether it has

improperly interfered with the business of some licensees in order to favor other towing

businesses, and other fraudulent or illegal activities."

44.    The DCA also issued a press release, and posted information

prominently on its website, boasting that the agency was investigating Metropolitan for

suspected fraud and other illegality.

45.    In addition, the DCA has prominently posted bright orange signs on

walls and countertops throughout the agency's offices that read: "ATTENTION: TOW

TRUCK COMPANIES AND DRIVERS  The Department of Consumer Affairs is investigating [Metropolitan] based on evidence that it has engaged in fraudulent and illegal activities."

46.     DCA employees have also refused to accept any filings by Metropolitan staff, have returned filings that we made prior to receiving Cohen's August 4 Letter, and have literally hung up the phone when Metropolitan Association employees have called.

**The DCA's Actions Have Irreparably Harmed Metropolitan and Its Members**

47.     Consistent with DCA's intent, Metropolitan's business has suffered significantly since August 10.  Metropolitan is now effectively prevented from engaging in any way with the DCA.  Such engagement previously represented approximately fifty-five percent of its business (55%).

48.     Prior to August 4, Metropolitan typically received an average of 120 calls a day.  That number has now plummeted to approximately 40 calls.

49.     To date, at least three members have ordered Metropolitan to cease doing work for them, have required that Metropolitan return their money, and have hired a competitor to do the job.  In addition, several other prospective new clients have informed Metropolitan that they will no longer be engaging its services.

50.     The DCA has not indicated how long its "emergency" measure against Metropolitan will last, nor when it expects to conclude its investigation.

**FIRST CAUSE OF ACTION**
(42 U.S.C. § 1983 – First Amendment)

51.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

52.     The First and Fourteenth Amendments to the United States Constitution

prohibit Defendants from abridging Plaintiffs' right to engage in protected speech, to

associate freely, and to petition the government for redress of grievances.

53. · The First and Fourteenth Amendments to the United States Constitution

likewise prohibit Defendants from retaliating against Plaintiffs for engaging in these

forms of protected activity.

54. Plaintiffs engaged in a variety of forms of protected First Amendment

activity, including publishing magazine editorials and providing public testimony critical

of DCA, and advocating to DCA on behalf of Metropolitan's members with respect to

matters of public concern.

55. Defendants wrongfully retaliated against Plaintiffs for engaging in this

protected First Amendment activity by, among other things, causing DCA to refuse to

accept for filing any documents filed or delivered by Plaintiffs; informing all ALJs that

they should consider, when "determining the credibility of witnesses" in any cases in

which Metropolitan represents a respondent, that Metropolitan is under "investigation"

for "repeatedly engaging in fraudulent or illegal activity"; causing DCA to issue a press

release, publish on its website, placing numerous signs in the publicly accessible spaces

in its offices, and sending hundreds of letters to Metropolitan's members announcing

gratuitously that Metropolitan is the subject of this "investigation."

56. By singling out Plaintiffs for unequal, retaliatory, and vindictive

treatment because it exercised its rights guaranteed by the First Amendment, Defendants

deprived Plaintiffs of their rights, remedies, privileges, and immunities guaranteed to

every citizen of the United States in violation of 42 U.S.C. § 1983, including, but not

limited to, rights guaranteed by the First and Fourteenth Amendments to the United

States Constitution.

57.    Defendants Mintz and Cohen – who controlled, operated, presided over, and/or were employed or controlled by the City – acted at all times under color of law.

58.    Defendant Mintz has final policymaking authority and establishes the official policy of DCA.

59.    Defendant Cohen's unconstitutional conduct was so persistent and wide, and so manifest, as to imply the constructive acquiescence of senior policy-making officials and thus amount to an official DCA custom, policy, and practice.

60.    Through Defendants Mintz, Cohen, and others, the unconstitutional conduct alleged herein was the City's official custom, policy, and practice.

61.    Defendants Mintz and Cohen conspired among themselves (and, upon information and belief, with others) to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the First and Fourteenth Amendments to the United States Constitution, and took numerous overt steps in furtherance of such conspiracy, or failed to prevent others from depriving Plaintiffs of their constitutional rights, as set forth above.

62.    Defendants Mintz and Cohen acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective roles as City employees or agents.  Defendants Mintz and Cohen acted beyond the scope of their jurisdiction, without authority of law, and abused their powers.  They acted willfully, knowingly, and with the specific intent to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the First and Fourteenth Amendments to the United States Constitution.

63.     By singling out Plaintiffs for retaliatory, vindictive, and unequal treatment with the intent to suppress and/or chill these protected activities, Defendants violated and continue to violate Plaintiffs' First and Fourteenth Amendment rights.

64.     As a direct and proximate result of Defendants' retaliatory conduct and abuse of authority, Plaintiffs have suffered and continue to suffer actual damages, in forms including but not limited to lost contracts, lost income, lost future earnings, reputational injury, and harm to Metropolitan's members and patrons.

65.     Plaintiffs are being irreparably harmed and have no adequate remedy at law.

## SECOND CAUSE OF ACTION
(42 U.S.C. § 1983 – Due Process Clause)

66.     Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

67.     Plaintiffs have protected property and liberty interests in their ability to file documents with and represent members before the DCA.

68.     Defendants made extremely stigmatizing statements about Plaintiffs, suggesting, among other things, that Plaintiffs are guilty of "repeatedly engaging in fraudulent or illegal activity."

69.     Defendants made these stigmatizing statements publicly by, among other things, publishing unsubstantiated allegations on DCA's website, issuing a press release, placing signs in publicly accessible areas of DCA's officers, and sending a mailing to Metropolitan's members.

70.     Defendants did not afford Plaintiffs even minimally adequate process before depriving them of their constitutionally protected liberty and property interests.

71.     Defendants have banned Plaintiffs from doing business with DCA entirely, ostensibly pending the resolution of its "investigation," without offering Plaintiffs any information whatsoever regarding the nature of the fraud DCA is alleging, let alone a meaningful opportunity to rebut the allegations.

72.     Defendants Mintz and Cohen – who controlled, operated, presided over, and/or were employed or controlled by the City – acted at all times under color of law.

73.     Defendants Mintz and Cohen conspired among themselves (and, upon information and belief, with others) to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the Due Process Clause of the Fourteenth Amendments to the United States Constitution, and took numerous overt steps in furtherance of such conspiracy, or failed to prevent others from depriving Plaintiffs of their constitutional rights, as set forth above.

74.     Defendants Mintz and Cohen acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective roles as City employees or agents.  Defendants Mintz and Cohen acted beyond the scope of their jurisdiction, without authority of law, and abused their powers.  They acted willfully, knowingly, and with the specific intent to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourteenth Amendment to the United States Constitution.

75.     By depriving Plaintiffs of their liberty and property interests without due process of law, Defendants violated and continue to violate Plaintiffs' Fourteenth Amendment rights.

76.     As a direct and proximate result of Defendants' abuse of authority,

Plaintiffs have suffered and continue to suffer actual damages, in forms including but not limited to lost contracts, lost income, lost future earnings, reputational injury, and harm to Metropolitan's members and patrons.

77.    Plaintiffs are being irreparably harmed and have no adequate remedy at law.

### THIRD CAUSE OF ACTION
(Tortious Interference with Contract)
(Against Defendants Mintz and Cohen only)

78.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

79.    Plaintiff Metropolitan has entered into various contracts with its members through which Metropolitan performs services in exchange for compensation.

80.    At all relevant times, Defendants were aware of the existence of Metropolitan's contracts with its members.

81.    By causing DCA to refuse to accept for filing any documents filed or delivered by Plaintiffs; informing all ALJs that they should consider, when "determining the credibility of witnesses" in any cases in which Metropolitan represents a respondent, that Metropolitan is under "investigation" for "repeatedly engaging in fraudulent or illegal activity"; causing DCA to issue a press release, publish on its website, placing numerous signs in the publicly accessible spaces in its offices, and sending hundreds of letters to Metropolitan's members announcing gratuitously that Metropolitan is the subject of this "investigation," Defendants knowingly and intentionally induced the breach of these contracts and/or rendered the performance of these contracts impossible.

82.    As such, Defendants have damaged Plaintiff Metropolitan in an amount

to be determined at trial.

## FOURTH CAUSE OF ACTION
(Tortious Interference with Prospective Business Advantage)

83.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth herein.

84.     Plaintiffs have business relationships with numerous existing and potential future members and clients.

85.     Defendants' public allegations that Plaintiffs are under "investigation" for "repeatedly engaging in fraudulent or illegal activity" were designed to impugn, and have had the effect of impugning, the basic integrity and creditworthiness of Plaintiffs' business.

86.     Defendants have publicly disparaged Plaintiffs with the intent to injure Plaintiffs' business.

87.     Defendants have directly interfered with Plaintiffs' business relationships with their existing and potential future members and clients.

88.     Defendants acted with the sole purpose of harming Plaintiffs and their business.

89.     Defendants acted through wrongful means, including by purposefully disseminating vague and unsubstantiated allegations that they were aware have no merit, and by purposefully exaggerating the gravity of the allegations.

90.     As a direct and proximate result of Defendants' actions, Plaintiffs have lost substantial business opportunities and have been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
(Article 78)

91.        Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

92.        Under state law, Defendants may not make determinations that are "arbitrary and capricious" or are an "abuse of discretion." N.Y. C.P.L.R. § 7803.

93.        Respondents acted arbitrarily and capriciously, abused their discretion, and/or violated state law when, on August 4, 2010, they barred Plaintiffs from filing any documents with DCA and informing all ALJs that they should consider, when "determining the credibility of witnesses" in any cases in which Metropolitan represents a respondent, that Metropolitan is under "investigation" for "repeatedly engaging in fraudulent or illegal activity."

94.        Defendants have not established any process or timeline for conducting their "investigation," nor have they afforded Plaintiff with any process or opportunity for challenging their actions or obtaining a final determination.

95.        Plaintiffs have been harmed and will continue to be harmed until the August 4, 2010 determinations are annulled, enjoined, and/or declared invalid.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a.    Temporarily, preliminarily, and permanently enjoining Defendants from violating Plaintiffs' rights;

b.    Awarding compensatory damages in an amount to be determined at trial;

c.    Awarding punitive damages in an amount to be determined at trial;

d.    Awarding reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

e.    Awarding such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       August 13, 2010

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By: _____
       Richard D. Emery (RE 5181)
       Eric Hecker (EH 0989)
       Zoe Salzman (ZS 9816)

75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

*Attorneys for Plaintiffs*